# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6876 | **DATE** | 5/25/2001 |
| **CASE TITLE** | Nancy E. Hannon vs. Leo Burnett Company, Inc. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion to dismiss the implied contract claim asserted against them in Count III of plaintiff's complaint is denied.

(11) ■ [For further detail see

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 29 2001 date docketed | 14 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 5/25/2001 | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 MAY 25 PM 12:28 | date mailed notice | |
| | kf courtroom deputy's initials | Date/time received in central Clerk's Office | Kf mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NANCY E. HANNON, )
)
Plaintiff, )
)
v. ) No. 00 C 6876
) Paul E. Plunkett, Senior Judge
LEO BURNETT COMPANY, INC., LEO )
BURNETT WORLDWIDE, INC., THE )
LEO BURNETT GROUP, INC., STAR )
REACHERS, LIMITED PARTNERSHIP, )
and RICHARD B. FIZDALE, )
)
Defendants. )

DOCKETED
MAY 29 2001

## MEMORANDUM OPINION AND ORDER

Nancy E. Hannon has sued defendants alleging securities fraud (Count I), breach of fiduciary duty (Count II) and breach of implied contract (Count III). Defendants have filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Count III. For the reasons stated below, the motion is denied.

### The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## Facts

Hannon, who had been an employee of Leo Burnett for more than ten years, voluntarily resigned from the company in April 1999. (Compl. ¶¶ 7, 17.) At the time of her resignation, Hannon owned three different kinds of securities that had been issued to her by Leo Burnett: (1) 8,000 class "A" common shares of Leo Burnett Worldwide, Inc. ("LBW"); (2) 13,740 class "B" shares of LBW; and (3) an interest in Star Reachers Limited Partnership ("SRLP"). (Id. ¶¶ 10-12, 16.) Under the Stock Purchase Agreement in effect between Hannon and LBW, Hannon's resignation triggered an automatic buyback of her shares of LBW. (Id. ¶ 18.) According to the SRLP Agreement, Hannon's resignation would terminate her interest in SRLP, which would distribute her interest to her at fair value on a valuation date to be determined by the general partners. (Id.)

When she decided to resign in April 1999, Hannon relied on statements previously made by Leo Burnett that it was dedicated to remaining a private entity and would not merge or sell to a holding company. (Id. ¶ 22.) Among other places, these statements were made in: (1) a December 9, 1998 memo from Defendant Fizdale to Leo Burnett's shareholders in which he reported that Leo Burnett was exploring a "'strategic alliance'" with Dentsu, Inc., the world's largest advertising agency, but stated that Leo Burnett "'will *not be discussing a merger* with Dentsu'" and that "'[s]taying private is still very important to us'" (id. ¶ 23) (emphasis in original); and (2) a December 9, 1998 memo from Fizdale to all Leo Burnett employees in which he said that Leo Burnett was "'[u]nwilling to sell to a holding company or go public'" and was "'*not discussing a merger* with Dentsu'" (id. ¶ 24) (emphasis in original). Similar comments were made by Leo Burnett in the December 1998 shareholders' meeting, a December 9, 1998 letter to its clients and a December 9,

1998 press release. (Id. ¶ 25.) When Hannon told Fizdale of her plans to resign, he did not tell her that the company's stance on these issues had changed. (Id. ¶ 26.)

A few weeks after Hannon resigned, Leo Burnett informed its shareholders that it had formed a holding company, TLG, and would convert all LBW stock into TLG stock. (Id. ¶ 27.) Subsequently, TLG merged with the McManus Group to form a holding company temporarily called BDM. (Id. ¶¶ 29-30.) Thereafter, Dentsu acquired a twenty-percent stake in BDM, which was then called Bcom3, Inc. (Id. ¶ 30.)

Hannon alleges that the merger discussions started before she resigned and were ongoing when she resigned. (Id. ¶ 31.) She also alleges that Fizdale was one of the Leo Burnett insiders who was fully aware of the existence and progress of those discussions. (Id. ¶¶ 32-33.) Had Fizdale informed her of the change in the company's philosophy, Hannon alleges, she would not have resigned when she did. (Id. ¶ 40.) Before the merger, Leo Burnett bought back the 21,7450 shares of LBW stock held by Hannon at a total price of $345,944.84. (Id. ¶ 19.) After the merger, those shares of stock were worth at least $2,543,500.00. (Id. ¶ 37.)

## Discussion

In Count III of her complaint, Hannon alleges that she had an implied employment contract with Leo Burnett that required it to refrain from opportunistic misconduct. She argues that Leo Burnett breached that duty when it accepted her resignation and repurchased her securities under the circumstances alleged in the complaint.

Plaintiff's claim rests entirely on the Seventh Circuit's decision in Jordan v. Duff & Phelps, 815 F.2d 429 (7th Cir. 1987), the facts of which are quite similar to those alleged here. Jordan was

an employee of Duff & Phelps ("D&P"), a closely-held company, who was permitted to purchase 188 shares of D&P stock as part of his compensation package. Id. at 432. Under the applicable stock purchase agreement, termination of employment with D&P for any reason would trigger an automatic buyback of Jordan's shares. Id.

On November 16, 1983, Jordan told Hansen, the chairman of the D&P Board, that he was resigning to accept a job with another firm. Id. Jordan did not ask Hansen about any potential mergers and Hansen did not volunteer any information, though Hansen knew that: (1) D&P's negotiators had recently reached a merger agreement with Security Pacific, which the D&P board subsequently vetoed, that placed a value of $50 million on D&P; and (2) the D&P board had decided two days earlier to solicit other bids for the firm. Id. at 432-33.

By mutual agreement, Jordan worked for D&P for the rest of the year so his stock would be bought back at its December 31, 1983 value, not its value at year end 1982, as it would have been under the stock purchase agreement had he left before the end of 1983. Id. at 432. Between Jordan's resignation and his actual departure from the firm, negotiations between D&P and Security Pacific resumed in earnest and the D&P board adopted a resolution that modified the stock purchase agreement to allow employees who were fired by the firm to retain their stock for five years thereafter, neither of which was disclosed to Jordan. Id. at 432-33.

Jordan sued D&P, claiming that it had violated federal securities laws by failing to disclose information that was material to his decision to sell his D&P stock back to the company. The district court granted summary judgment to D&P and the Seventh Circuit reversed. In its view, D&P had a duty under federal law to disclose material information to Jordan and a reasonable jury could

4

conclude that the information D&P had withheld was, indeed, material to Jordan's decision to terminate his ownership of D&P stock. Id. at 434.

Judge Posner dissented, reasoning, in part, that "the contingent nature of Jordan's status as a shareholder negates the existence of a right to be informed and hence a duty to disclose." Id. at 446. Indeed, Judge Posner said, imposing a duty to disclose in this context would be pointless. Because the stock purchase agreement explicitly conditioned Jordan's retention of stock on his continued employment and his employment was at will, D&P could have disclosed the information to Jordan and fired him immediately thereafter, even if D&P's only reason for doing so was to sweeten the deal for the other stockholders at Jordan's expense. Id. at 446-47

In response to this argument, the majority said: "[E]mployment at will is still a contractual relation, one in which a particular duration . . . is implied." Id. at 438. "One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other." Id. Had D&P fired Jordan just before the merger solely to enrich the other shareholders, the majority said, it would have breached this implied contractual duty. Id. at 439. "As a result," the majority concluded, "Jordan's employment at will, the essential ingredient of [Judge Posner's] argument that Jordan waived the duty to disclose, does not establish that the firm had no duties concerning the stock." Id.

Jordan is a securities fraud case. Thus, the court's view of the contractual duties inherent in an at will employment relationship is *dicta*. That *dicta* suggests, however, that if an employer were to fire an at-will employee immediately before a merger solely to prevent him from reaping the anticipated profit on the company's stock it would violate its duty not to engage in opportunistic misconduct. We see little distinction between that scenario and the one alleged by plaintiff, that her

5

employer accepted her resignation without telling her that its recent and repeated representations that no merger was in the offing were incorrect. Though <u>Jordan</u> does not suggest that an employer must disclose to its employees any and all information that might bear on their decision to resign, it does suggest that an employer's failure to correct its own material misrepresentations before accepting an employee's resignation violates its duty not to engage in opportunistic misconduct. Whether plaintiff can adduce the facts necessary to prove this claim remains to be seen. At this stage, however, her allegations are sufficient to state a breach of contract claim as outlined in <u>Jordan</u>.

### Conclusion

For the reasons set forth above, defendants' motion to dismiss the implied contract claim asserted against them in Count III of plaintiff's complaint is denied.

**ENTER:**

**UNITED STATES DISTRICT JUDGE**

DATED: 5/25/01